Beverly W. Garofalo (BW 7425)
THELEN REID BROWN
RAYSMAN & STEINER LLP
185 Asylum Street
CityPlace II, 10th Floor
Hartford, Connecticut 06103
(860) 275-6400 Telephone
(860) 275-6410 Facsimile

*Attorney for Defendant, Equant Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
CHRISTINE CITRO LOGIUDICE,                  :

                                      :

            Plaintiff,           :

                                        :

            -against-          :

                                        :

EQUANT INC.,                                :

                                        :

            Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Civil Action No.
05 CV 7416 (MGC)

**LOCAL RULE 56.1 STATEMENT**

### EQUANT INC. STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Defendant Equant Inc.

("Equant" or the "Company") submits this statement of undisputed facts in support of its Motion

for Summary Judgment. The following material facts are undisputed:

1.  Equant is a provider of global voice and data network communications services with

operations in the United States. Equant is now operating under the name Orange Business

Services. (Declaration of Fran Bird ("Bird Decl."), attached hereto as Exhibit ("Exh.") A, ¶ 3);

*see also* Plaintiff's Deposition attached hereto as Exh. 1 to Declaration of Beverly Garofalo

("Garofalo Decl."), attached hereto as Exh. B, ("Pl. Dep."), 5:13-19).

1

2.   Plaintiff Christine Citro LoGiudice began working as an Account Manager in Equant's New York City office in 1999. (Pl. Dep. 21:23-25, 24:21-25:1; *see also* Bird Decl. ¶ 6).

3.   Account Managers at Equant are assigned to a group of accounts by Equant for which they are responsible, including looking for opportunities to sell additional products and services, expanding the relationship and addressing the client's issues or concerns. (Declaration of Sean Connolly ("Connolly Decl."), attached hereto as Exh. C, ¶ 3; Deposition of Sean Connolly, attached hereto as Exh. 2 to Garofalo Decl., ("Connolly Dep."), 130:24-131:6; Pl. Dep. 22:16-23:9). Business Development Executives ("BDE") at Equant, in turn, are primarily responsible for identifying and bringing new customers to Equant. (Connolly Decl. ¶ 4).

4.   Throughout her tenure at Equant, plaintiff's performance as an Account Manager has consistently been rated highly and she has been viewed as a "top" performer. (*See* Pl. Dep. 16:3-5, 63:13-20, 64:20-65:11, 97:6-11).

5.   From 1997 through approximately 2001, plaintiff reported to Patrick DelVecchio, Sales Manager at Equant, with whom she enjoyed a "very good relationship." (Pl. Dep. 21:21-24:10).

6.   Starting in 2001 and continuing through the present, plaintiff has been reporting to Jim Madden, Business Development Manager for New York and New Jersey, with whom she also has enjoyed a "good working relationship." (Pl. Dep. 26:2-28:17).

7.   Mr. Madden has at all times relevant hereto reported to Kevin Johnston, Regional Area Sales Manager, who, in turn, has reported to Sean Connolly, Senior Vice President of North America. (Pl. Dep. 26:2-27:8; Connolly Dep. 31:16-19).

8.   At the start of plaintiff's employment, Mr. DelVecchio assigned her to manage the accounts of Warnaco and Pfizer, as well as some smaller accounts.  (Pl. Dep. 23:10-24:10).  In or about 1999, Mr. DelVecchio also assigned plaintiff to the Bank of New York ("BONY") account.  (Pl. Dep. 29:13-20).

9.   Plaintiff's accounts were realigned in or around 2000.  Following the realignment and continuing through 2004, Ms. Citro was the Account Manager on the BONY, Merrill Lynch and Global Execution Technologies ("G Trade") accounts.  (Pl. Dep. 28:18-29:21).

10. Throughout her employment, plaintiff received a base salary and was also eligible for sales compensation subject to achieving certain annual sales goals that were assigned at the beginning of each year.  (Pl. Dep. 182:6-14).

11. Plaintiff was given a written goal sheet that set forth her annual sales goals for the year.  (Pl. Dep. 132:25-133:124, 180:11-184:16; Connolly Dep. 133:16-137:17; *see also* 2004 Citro-LoGiudice Goal Sheet, attached as Exh. 25 to Connolly Decl.).

12. In order to be eligible for sales compensation, plaintiff was required to sign her goal sheet.  The goal sheet provided that it could be modified at any time before it was signed. (Pl. Dep. 130:19-23, 132:25-134:7,180:11-3, 183:25-13; *see* Exh. 25 to Connolly Decl.).

13. In 2004, plaintiff signed her goal sheet on July 23, 2004.  (Exh. 25 to Connolly Decl.).

14. Sales goals are based on a number of factors, including performance from the prior year and business in the pipeline at the time goals are developed. (Connolly Decl. ¶ 32).

15. Annual sales goals are intended to be realistic and achievable while at the same time incentivizing salespeople to work throughout the year and improve over the prior year.  (*See* Connolly Decl. ¶ 33;  Pl. Dep. 182:24-183:11).

16. The goal sheet also sets forth an account manager's target variable salary ("TVS"), which is the amount of additional sales compensation he or she will receive if 100% of the sales goals are achieved. The combination of base salary and TVS is deemed to be the account manager's on-target earnings ("OTE") for the year. (*See* Exh. 25 to Connolly Decl.).

17. Plaintiff's base salary in 2004 was $93,385.98. (Bird Decl. ¶ 7). In addition, her goal sheet for 2004 specified a TVS of $57,888, which is the amount she would receive if she met 100% of her sales goals. (Pl. Dep. 182:6-11). Accordingly, if she were "on target" in 2004, meaning that she met 100% of her goals, her total OTE in 2004 would have been approximately $151,273.98. (Pl. Dep. 182:6-11; Bird Decl. ¶ 9; Connolly Decl. ¶ 35).

18. In 2004, plaintiff earned $271,496.89, which far exceeded her 2004 "on target" earnings. (Bird Decl. ¶ 9).

19. The manner in which sales compensation is earned and calculated at Equant is published in a sales compensation plan each year. (Pl. Dep. 130:13-132:17; Connolly Dep. 101:14-25).

20. The 2004 Sales Compensation Plan (the "Sales Compensation Plan") was presented at Equant's annual sales kickoff event in January or February 2004. Equant reviewed the Sales Compensation Plan in detail with the sales team, and such review included a PowerPoint presentation that summarized key provisions. (Pl. Dep. 130:24-131:24; 2004 Sales Compensation Plan, attached hereto as Exh. 1 to Declaration of Caren Gaffney ("Gaffney Decl."), attached hereto as Exh. D; 2004 PowerPoint, attached hereto as Exh. 2 to Gaffney Decl.).

21. Plaintiff read the Sales Compensation Plan. (Pl. Dep. 131:16-18).

4

22. Appendix 4 of the Sales Compensation Plan, entitled "Reward for Special Business"

(the "Special Business Plan" or "SBP") provided as follows:

> Rewards for Special Business includes all Approved Contracts for
> new Special Business Opportunities (SBO) signed in 2004 with a
> minimum of US$50M total contract value or US$10M annual
> revenue, including all Outsourcing Opportunities which are
> defined below.

(Exh. 1 to Gaffney Decl.).

23. The SBP provides that: "A bonus pool will be established to compensate eligible

personnel for closing Special Business Opportunities based on the Approved Contract value,

Contract duration and if the sale is a new or existing Customer as detailed below." (*See* Exh. 1

to Gaffney Decl.).

24. Pursuant to the SBP, for non-outsourcing opportunities with annual revenue between

$10 Million and $50 Million, the minimum bonus pool was $60,000 with .001 for each dollar of

incremental contract value beyond that, subject to an adjustment for low margins. The SBP also

provided that "the amount of the bonus pool will be adjusted . . . when the gross margin

percentage for the sale is 15% or less." If the gross margin percentage was less than 5%, the

bonus is reduced to 25% of the full amount. (Exh. 1 to Gaffney Decl.). In March 2004, Equant

also amended the Sales Compensation Plan to provide that the amount of sales compensation

payable on any transaction with profit margins of 5% or less, no matter the size of the

transaction, would be at the sole discretion of the Company. (Exh. 1 to Gaffney Decl.).

25. The PowerPoint presentation made at the sales kick-off included a slide that

summarized the terms of the SBP, including that it applied to "standard opportunities > US

$10M annual revenue." (Exh. 2 to Gaffney Decl.; *see* Pl. Dep. 130:16-131:24).

5

26. The 2004 Sales Compensation Plan provides that "[i]n the event of any ambiguity or disputes about interpretation of the plan, Equant's interpretation shall prevail." (Exh. 1 to Gaffney Decl.).

27. At all times relevant hereto, Equant had an Employee Handbook. (Bird Decl. ¶ 8; *see* Exh. 1 to Bird Decl.). Plaintiff acknowledges having seen a copy of Equant's Employee Handbook. (Pl. Dep. 165:10-19).

**BONY Transaction**

28. Toward the end of 2003 and continuing until the beginning of 2004, Equant encouraged its employees to sell network maintenance services to its customers. (Pl. Dep. 125:25-126:4, 131:25-132:24; Connolly Dep. 89:7-13).

29. Equant could offer various network maintenance service solutions to its customers, including maintenance that would be performed solely by Equant, maintenance that would be provided solely by network provider Cisco Systems, Inc. ("Cisco") or a combination of both. The Cisco maintenance service offering was referred to as Cisco SMARTnet maintenance services ("SMARTnet Services"). If a customer experienced problems with its Cisco hardware, pursuant to the terms of the SMARTnet Services, Cisco would provide the maintenance services to Equant's customers. (Pl. Dep. 114:24-115:17, 131:10-13; Connolly Dep. 84:4-12; 85:4-9; 91:16-19).

30. Equant was a Cisco "gold partner" and a "reseller" of Cisco SMARTnet Services. (Pl. Dep. 114:24-116:17). Equant's customer would purchase such a SMARTnet Services from Equant. Equant, in turn, would purchase the SMARTnet Services from Cisco. (Pl. Dep. 114:24-116:17). Consequently, the profit margin on the sale of SMARTnet Services tended to be small. (*See* Pl. Dep. 85:4-9, 124:2-125:25).

6

31. Prior to 2004, Equant had reported gross revenues received on the sale of SMARTnet Services in its financials. (Pl. Dep. 134:6-136:21).

32. Prior to 2004, plaintiff never sold a SMARTnet Services. (Pl. Dep. 115:2-13).

33. In May or June 2003, plaintiff and Mr. Madden met with Jeff Cohen, the Senior Vice President of BONY, an account to which plaintiff had been assigned, to explain the services offered by Equant, including network maintenance services. (Pl. Dep. 115:17-116:13).

34. In August or September 2003, Equant, along with at least one other company, responded to a Request for Proposal ("RFP") issued by BONY to provide services to BONY and its wholly-owned subsidiary Pershing LLC. (Pl. Dep. 116:25-117:23, 119:17-19, 121:18-122:19, 128:18-129:17).

35. In response to the RFP, Equant submitted a proposal to provide one of two types of maintenance services to BONY and Pershing: the Shared Support Model, which is the offering of hybrid maintenance services between Equant and Cisco, and SMARTnet Services. (Pl. Dep. 116:25-117:23, 119:17-19, 121:18-122:19).

36. BONY was interested in the offer of SMARTnet Services. However, it informed Equant that, in order to win this business, Equant had to do better on its pricing. According to plaintiff, "Bank of New York told us exactly where we needed to be." (Pl. Dep. 123:5-127:22).

37. In order to offer the pricing that BONY was seeking, approval had to be obtained from Howard Ford, President of Global Sales at Equant. (Pl. Dep. 123:4-128:3; Connolly Dep. 129:8-20).

38. The transaction was presented to Mr. Ford as a Bank of New York 3-Year SMARTnet opportunity and reflected that the customer had come back stating the number to win was slightly under $12 Million. At this price, the SMARTnet Services would be sold "at cost."

(*See* E-Mail from Jim Macchiarola, attached hereto as Exh. 3 to Connolly Decl.; Pl. Dep. 127:11-21).

39. Plaintiff and her management team ultimately secured approval from Mr. Ford to make a final proposal that met BONY's stated requirements. (Pl. Dep. 123:4-128:3; Connolly Dep. 129:8-20).

40. Plaintiff sent a letter dated February 3, 2004, to Jennifer Oakes, Assistant Treasurer of BONY, providing Equant's final, best offer of $11,842,601 for SMARTnet maintenance services. (Pl. Dep. 173:2-175:4; *see also* Letter to Jennifer Oakes, attached as Exh. 4 to Connolly Decl.).

41. Plaintiff also attended a meeting with representatives from BONY and Pershing to present Equant's "best and final offer" (Pl. Dep. 128:3-10; *see also* Exh. 4 to Connolly Decl.). That day, Equant learned that it had won the BONY SMARTnet business on the terms presented in its final offer. (Pl. Dep. 128:3-129:16)

42. Total revenue on the BONY SMARTnet transaction was $12,169,021.00. Equant's cost on the transaction was $11,962,578. Thus the net margin of profit on the transaction was a mere $206,443.00. (*See* December 15, 2004 E-Mail from Melissa Poole, attached hereto to as Exh. 1 to Declaration of Norm Wentworth ("Wentworth Decl."), attached hereto as Exh. E).

43. BONY and its wholly-owned subsidiary issued separate purchase orders in the amounts of $5,769,240 and $7,069,942, respectively, for the SMARTnet Services. (*See* Purchase Orders attaches as Exh. 19 to Connolly Decl.).

44. Soon after winning the BONY SMARTnet business, Equant was informed by its outside accountants that because substantially all the revenue on SMARTnet Services was "pass through" revenue, it could not report the gross revenue in its financials, but only the actual profit

on the transaction.  (*See* March 31, 2004 to April 2, 2004 E-Mails, attached as Exh. 1 to Connolly Decl.).

**Commission Claim on the SMARTnet Transaction**

45. A dispute thereafter arose concerning sales compensation on the BONY SMARTnet transaction.  (*See* Pl. Dep. 105:9-107:14).

46. The BONY SMARTnet transaction resulted in annual revenue to Equant in 2004 of $12,169,021.00, which was over $10 Million, and, therefore, the bonus was payable under the Special Business Plan ("SBP") contained within the Sales Compensation Plan.  The minimum bonus pool under the SBP was $60,000 with .001 for each dollar of incremental contract value.  Therefore, the bonus pool on the BONY SMARTnet transaction was $62,169, calculated by subtracting the $10,000,000 threshold from the total revenue of the contract ($12,169,021.00 – $10,000,000 = $2,169,021), then that amount was multiplied by the .001 for each dollar above the threshold ($2,169,001 * 0.001 = $2,169.02), and then added to the minimum bonus pool of $60,000 ($60,000 + $2,169.02 = $62,169).  The profit margin on the BONY SMARTnet transaction, however, was less than 5%.  Thus, in accordance with the terms of the SBP, plaintiff was eligible for just 25% of the $62,169 bonus pool, which was equal to $15,542.  (Gaffney Decl. ¶ 6).

47. Under the terms of the SPB, only the quota bearing salesperson, which in the case of the BONY SMARTnet transaction was plaintiff, was eligible for a bonus on a non-outsourcing SBO.  (Exh. 1 to Gaffney Decl.).

48. According to plaintiff, by plugging the total value of the BONY SMARTnet transaction into plaintiff's sales compensation workbook, Mr. Johnston had calculated sales compensation owing to plaintiff on the BONY Transaction at approximately $540,000.  (Pl. Dep. 140:20-143:20; Connolly Dep. 15:10-24).

49. Computed in a similar manner, Mr. Johnston and Mr. Madden, who, like plaintiff, believed they were entitled to substantial sales compensation, would have been eligible to receive approximately $95,547.00 and $46,750.00, respectively. (*See* March 12, 2004 E-Mail, attached hereto as Exh. 20 to Connolly Decl.).

50. Accordingly, the sales compensation that plaintiff and her management team believed was due them on the BONY SMARTnet transaction was $898,791.00, which was approximately four times the total profit on the transaction. (*See* Exh. 20 to Connolly Decl.).

51. Although Mr. Connolly did not agree that plaintiff and her management team were entitled to the sales compensation they were seeking, he also realized that they would not be satisfied with the payout under the SBP.  Accordingly, Mr. Connolly acted as an "advocate" on plaintiff's behalf in an effort to obtain additional sales compensation for plaintiff and her management team, including actively lobbying senior management through discussions and e-mails. (*See* Connolly Dep.16:21-17:18; 19:22-26:29; 139:15-19; 158:7-159:16; 160:23-162-7).

52. For example, on March 4, 2004, Mr. Connolly wrote an e-mail to Mr. Smith in which he highlighted the "extremely hard" work of plaintiff and her management team and requested support in his efforts to obtain greater sales compensation for the team. (*See* March 4, 2004 E-Mail from Connolly to Smith, attached hereto as Exh. 11 to Connolly Decl.).

53. Keeping the team apprised of his efforts, Mr. Connolly informed Mr. Johnston that he had "[s]pent an exorbitant amount of time" on the sales compensation issue on the BONY – SMARTnet transaction, but indicated that "Jacques [Kerrest, Chief Financial Officer,] is on a witch hunt on these types of deals as he looks at the margin and is inspecting the compensation plan on payout factors." He indicated that Mr. Smith agreed that the payout under the SBP would not be acceptable and emphasized the need to "figure out a workaround and do this

10

swiftly so Christine is happy." He closed his e-mail to Mr. Johnston by stating that he was "[f]ighting the good fight." (*See* March 4, 2004 E-Mail from Connolly to Johnston attached hereto as Exh. 12 to Connolly Decl.).

54. On April 6, 2004, Mr. Connolly sent an e-mail to Mr. Smith raising concerns about the level of disruption that would result from paying plaintiff under the SBP and recommending that Equant "reward the sales team for following the direction set for them." (*See* April 6, 2004 E-Mail from Connolly to Smith, attached hereto as Exh. 13 to Connolly Decl.).

55. Plaintiff guesses that in or around May or June 2004, Mr. Madden told her that sales compensation on the BONY transaction would be paid under the SBP. (Pl. Dep. 148:6-22.)

56. The issue of sales compensation remained unresolved through the Spring of 2004. In early June 2004, plaintiff spoke to Fran Bird, Head of Human Resources, North America, about her frustrations concerning "Equant's approach on my compensation for The Bank of New York." (*See* June 4, 2004 E-Mail from Plaintiff to Bird, attached hereto as Exh. 4 to Bird Decl.).

57. Ms. Bird forwarded plaintiff's e-mail to Oscar Pulido, Human Resources, Americas Region, who, in turn, forwarded the e-mail to Mr. Connolly. Mr. Connolly responded that he had been "working on this issue for the entire first quarter with limited success." He indicated that he had had discussions with the highest levels of management, but had not had success and explained that senior management was focused on paying the transaction as an SBO under the SBP. Again advocating for plaintiff and her management, he sought assistance in helping to close out the matter "with a positive outcome." (*See* June 4, 2004 and June 6, 2004 E-Mails from Connolly, Pulido, Bird, attached hereto as Exh. 14 to Connolly Decl.).

58. On June 7, 2004, plaintiff sent Mr. Connolly an e-mail asking whether he had made "any progress on the compensation for Bank of New York" and informing him that his "support

11

is greatly appreciated." (*See* June 7, 2004 E-Mails between Plaintiff to Connolly, attached hereto as Exh. 15 to Connolly Decl.).

59. In an e-mail to plaintiff, Mr. Connolly responded that he was "committed to working to a resolution" and that he fully recognized "the value of the marquis win with BONY" and stating that it was his goal to get her the recognition she deserved. (Exh. 15 to Connolly Decl.).

60. Plaintiff thanked Mr. Connolly for his "continued support." (Exh. 15 to Connolly Decl.).

61. In or around June 2004, Mack Treece replaced Mr. Smith as Head of Sales for North America. Soon thereafter, Mr. Connolly contacted Mr. Treece concerning the "open issue of payment on the BONY Smartnet sale." He requested a call to discuss the matter and described plaintiff as "a top talent within my business [who] has been a major contributor to Equant over the past 5 years." (*See* June 21 E-Mail from Connolly to Treece, attached hereto as Exh. 16 to Connolly Decl.).

62. On June 15, 2004, Mr. Connolly provided background information concerning the dispute to Caren Gaffney, Director, Global Sales Compensation, and Philippe Koebel, then Senior Vice President Global Sales. (*See* June 15, 2004 E-Mail from Connolly to Koebel, attached hereto as Exh. 21 to Connolly Decl.).

63. The following day, Ms. Gaffney reviewed the background and circumstances of the dispute with Mr. Koebel. She informed him that "this opportunity *clearly falls under the Special Business Plan (SBP)* and no room for ambiguity unless there was an agreement made outside the plan." (*See* June 16, 2004 E-Mail from Gaffney to Koebel, attached hereto as Exh. 3 to Gaffney Decl.) (emphasis added)). Applying the formula contained within the SBP, Ms. Gaffney

calculated the maximum payout to plaintiff on the BONY SMARTnet transaction at $15,542.00. (Exh. 6 to Gaffney Decl.).

64. Thereafter, notwithstanding the fact that the BONY SMARTnet transaction was an SBO and sales compensation should have been calculated under the SBP, Mr. Treece secured approval from senior management to offer plaintiff $90,000, which was at or about an amount that Mr. Connolly believed that plaintiff would be willing to accept. (Connolly Dep. 26:10-26:22, 158:23-159:16, 162:19-163:6; see also July 27 E-Mail from Connolly to Treece, attached hereto as Exh. 18 to Connolly Decl.).

65. Plaintiff rejected the offer. (Connolly Decl. 26:23-27:2, 162-19-163:6; Pl. Dep. 85:2-88:8, 151:2-152:19; Gaffney Decl. ¶ 8; Exh. 3 to Garofalo Decl.).

66. Describing plaintiff as an "exemplary employee," to Mr. Treece, Mr. Connolly requested that a meeting be held amongst himself, plaintiff and Mr. Treece to review the sales compensation issue. (*See* July 17, 2004 e-mail, attached hereto as Exh. 18 to Connolly Decl.).

67. Management subsequently sought approval for an additional $20,000 to pay open sales compensation to Mr. Madden and Mr. Johnston. (*See* August 9, 2004 E-Mail from Gaffney to Ford, attached hereto as Exh. 4 to Gaffney Decl.).

68. Unable to reach a resolution that was acceptable to plaintiff, in or about December 2004, Equant tendered to plaintiff a check in the amount of $15,542 representing payment in full for all monies due and owing to plaintiff on the BONY SMARTnet transaction. Plaintiff rejected the payment and asked that it not be deposited into her account. Equant has remained ready, willing and able to pay that amount. (*See* Bird Decl. ¶ 8; December 21, 2004 Letter from Condon to Garofalo, attached hereto as Exh. 3 to Garofalo Decl.).

13

**Plaintiff's Breach of Contract Claim**

69. Plaintiff claims that, in failing to pay her $540,000 -- the amount she claims is due and owing to her on the BONY SMARTnet transaction -- Equant breached the Sales Compensation Plan. (*See* Pl. Dep. 140:20-143:20).

70. Plaintiff has not disputed Equant's calculation under the SBP but, rather, claims that the BONY SMARTnet transaction should not have been treated as an SBO nor calculated under the SBP solely for the following two reasons:

> One, it's two separate contracts, two separate PO's, one from Pershing, one from Bank, and neither of them are – is greater than 10 million, and No. 2, special business is under the section of bonuses. Bonuses – I define bonuses as something above and beyond, there's [a Minimum Revenue Guarantees ("MRG")] bonus that is under the same heading, I would get paid compensation, commission plus an MRG bonus, not just an MRG bonus, I don't think it logically makes sense.

(Pl. Dep.152:10-153:7.)

71. MRG Bonuses, by their terms, fall under the heading of "*Additional* Rewards" in the Sales Compensation Plan. (*See* Exh. 1 to Gaffney Decl.) In contrast, the 2004 Sales Compensation Plan expressly states under the heading "Rewards for Special Business" that "Compensation for Special Business Opportunities *is not applicable under this Plan and associated quota is not included in your Goal Sheet.* " (Exh. 1 to Gaffney Decl.) (emphasis added)).

72. When asked at her deposition to state what she relied upon to cause her to believe the sale of SMARTnet maintenance services to BONY was, in fact, two separate transactions, plaintiff stated only that "[t]here's two PO's, Pershing and then one from the Bank of New York." (Pl. Dep. 153:18-24.)

14

73. Plaintiff testified that, in advocating for a higher payout on the BONY SMARTnet transaction, she had explained to Mr. Treece and Mr. Connolly "that *if you really want to be technical*, it really is not one contract, it's not a $10 million, it's two separate contracts." (Pl. Dep. 86:24-88:3) (emphasis added)).

74. At no point prior to the issuance of separate purchase orders by BONY and its wholly-owned subsidiary Pershing *after* Equant had been awarded the business was the BONY SMARTnet transaction ever treated as two separate transactions.  For example:

> a.    BONY issued a single Request for Proposal ("RFP") to Equant to which Equant responded.  (Pl. Dep. 116:25-117:23, 119:17-19, 121:18-122:19).
>
> b.    In response to the RFP, Equant submitted a single proposal to provide services to BONY and its wholly-owned subsidiary Pershing.  (*See* Pl. Dep. 116:25-117:23, 119:17-19, 121:18-122:19, 128:18-129:7; *see also* Exh. 4 to Connolly Decl.).
>
> c.    Equant attended a single meeting and presented a single PowerPoint to summarize its proposal to offer maintenance services to BONY and Pershing.  (Pl. Dep. 116:25-117:23, 119:17-19, 121:18-122:19).
>
> d.    BONY informed plaintiff of the number it needed to win the business.  (Pl. Dep. 123:5-127:22).
>
> e.    When BONY sought additional concessions from Equant, approval was needed from the highest levels of Equant management, including Mr. Ford.  In an e-mail that plaintiff testified was accurate and not misleading in any fashion, an escalation package was presented to Mr. Ford for approval that described the opportunity as the BONY transaction with a value of approximately $14 Million. (Pl. Dep. 123:4-128:3, 154:23-155:8, 173:4-175:4; Exh. 3 to Connolly Decl.).

f.      Hoping to capitalize on the BONY "marquis" name, and nothwithstanding the low margin, Equant senior management ultimately authorized the sales team to close the deal on the terms plaintiff and her managers had proposed. (Pl. Dep. 23:4-125:5, 127:11-128:3; *see* E-Mail dated January 30, 2004 from Jim Madden, attached hereto as Exh. 2 to Connolly Decl.; March 2004 E-Mail from Smith, Ford attached hereto as Exh. 5 to Connolly Decl.).

g.      Plaintiff presented Equant's final, best offer in a single meeting attended by representatives of BONY and Pershing. (Pl. Dep. 128:3-10).

h.      The final, best offer was also presented in a letter addressed solely to Jennifer Oakes, Assistant Treasurer of the Bank of New York. (Pl. Dep. 128:3-13; Exh. 4 to Connolly Decl.).

i.      The additional monetary concession Equant gave on the transaction was characterized as a "240,000 signing bonus" and was not separately apportioned between the parent and its subsidiary. (Exh. 4 to Connolly Decl.; *see also* Exh. 10 to Connolly Decl.).

j.      There were no discussions with Equant that Pershing might go with one vendor and BONY might go with another. As plaintiff recognized, BONY and Pershing "got more incentive by combining the two" systems into one. (Pl. Dep. 129:17-130:3).

k.      Countless internal e-mails referred to the BONY deal as a single transaction and emphasized its value of approximately $12 to $14 Million. (*See* January 22, 2004 E-Mail from Plaintiff to Connolly, attached as Exh. 8 to Connolly Decl.; Exh. 2 to Connolly Decl.; January 23, 2004 E-Mail from Connolly to Smith, attached

16

hereto as Exh. 9 to Connolly Decl.; Exh. 4 to Connolly Decl ; February 1, 2004 E-Mail, attached as Exhibit 10 to Connolly Decl.; February 3, 2004 E-Mail from Plaintiff to BONY team, attached as Exh. 6 to Connolly Decl. ("I would like to thank everyone for their hard work, creative thinking and quick response in delivering our best and final *offer to The BONY . . . The finance team from The BONY* was very happy with our *offer* and strongly reinforced our positive position.") (Emphasis added); February 18, 2004 E-Mail from Johnston to Smith, Connolly, attached as Exh. 7 to Connolly Decl.).

l.     Even the Pershing's purchase order indicated it was "in reference to Cisco's BNY/Pershing Agreement signed by BNY."  (Exh. 19 to Connolly Decl.).

75. In 2004, plaintiff achieved 100% of her sales goals without including the BONY SMARTnet transaction. (Pl. Dep. 183:12-17).

76. Plaintiff's goal sheet had not contemplated a $12 Million sale of SMARTnet services. (*See* Exh. 25 to Connolly Decl.; Connolly Decl. ¶ 36).

77. Because plaintiff had not yet signed her goal sheet at the time the BONY transaction closed, Equant could have simply increased her sales goals to account for the BONY SMARTnet transaction, which, in turn, would have substantially lowered the sales compensation calculation obtained by plugging the value of the BONY SMARTnet transaction into plaintiff's sales workbook.  (Connolly Decl. ¶ 37).

**Plaintiff's Claims of Disparate Impact**

78. Plaintiff claims in her Amended Complaint that Equant maintained a policy and practice of encouraging male salespeople to take their clients to topless clubs and of excluding women from company outings and that this, in turn, had a disparate impact on female employees,

17

including herself, in terms of lost bonuses, lost sales and lost promotional opportunities.  (Am. Compl. ¶¶ 61-72).

**Topless Clubs**

79. In 2004, Equant had approximately 81 salespeople in the United States.  (Bird Decl. ¶ 4).

80. Although plaintiff alleges that male salespersons of Equant took clients to topless clubs "regularly," she acknowledges that she has "no facts" to support this allegation and, instead, has relied on rumors. (Pl. Dep. 55:7-20).

81. In fact, plaintiff has knowledge of just three alleged instances of employees taking clients to topless clubs during her approximately ten years of employment at Equant.  These alleged instances occurred in the 2001 to 2002 time frame.  (Pl. Dep. 47:22-58:23).

82. Plaintiff agreed that Equant did not "outwardly state they encourage" the taking of clients to topless clubs. (Pl. Dep. 53:20-22).  Although plaintiff believed Equant "tolerated" this type of entertainment, she lacks any facts to support this belief. (Pl. Dep. 53:17-19).

83. Plaintiff has no facts to cause her to believe that going to topless clubs was a "practice" at Equant beyond the rumors she has heard.  (Pl. Dep. 55:16-58:15).

84. Plaintiff also acknowledges that Equant did not maintain any sort of written policy about having male employees take clients to topless clubs.  (Pl. Dep. 54:11-14). She has no facts causing her to believe there was an "unwritten policy" other than that Equant allegedly tolerated it. (Pl. Dep. 54:15-19).

85. Since November 2003, Equant's Code of Conduct has expressly prohibited employees from taking clients to topless clubs.  (*See* Equant's Code of Conduct, attached hereto as Exh. 2 to Bird Decl. ("it is never appropriate to conduct business entertainment in an 'adult establishment' or club or venue")).

18

86. Plaintiff claims that she learned of salespeople allegedly taking customers to topless clubs on a handful of occasions through "passing comments." (Pl. Dep. 47:22-24, 55:24-58:15).

87. For example, plaintiff testified that in or around 2002, Howard Rothstein, an Account Executive, told her that he had gone to a topless club with the Chief Investment Officer ("CIO") of one of his clients. (Pl. Dep. 47:25-13). Plaintiff believes, but is not certain, that members of Equant sales management were also in attendance. (Pl. Dep. 47:14-25). Plaintiff also once heard a rumor that the CIO of this client liked going to topless clubs. (Pl. Dep. 56:17-57:2)

88. Plaintiff also alleges that in or around 2002 or 2003, John Jackson, a member of the sales team in Equant's New York office, who has since passed away, mentioned that he had gone to Scores, a topless club, with a client. (Pl. Dep. 49:2-50:16).

89. Neither Mr. Rothstein nor Mr. Jackson informed plaintiff that Equant had "encouraged" them to go to a topless club. (Pl. Dep. 52:4-11).

90. Plaintiff also testified that she had a discussion in 2004 with Bill Pattison, formerly an Integration Specialist at Equant, who allegedly confirmed that he had gone to a topless club in or around 2002. (Pl. Dep. 50:17-52:14).

91. Beyond that, plaintiff only heard passing comments in 2002 or 2003 about certain clients that allegedly liked going to topless clubs or about clients going to topless clubs. (Pl. Dep. 55:16-17; 57:3-59:15). However, as a general matter, plaintiff does not recall the specifics of these conversations. (Pl. Dep. 57:3-58:15).

92. Mr. Connolly testified that on one occasion in 2002 he was at a topless club with Mr. Rothstein's client. He recalls that the client had invited members of the sales team to the club. This was the only occasion during Mr. Connolly's tenure that he visited a topless club. (Connolly

19

Dep. 202:3-7, 228:3-9, 230:21-231:5).   This was the only client at Equant that Mr. Connolly had
ever heard liked going to topless clubs.  (Connolly Dep. 232:21-233:13).

93. Plaintiff agreed that she did not have any direct knowledge of any Equant employee
attending a topless club since 2002. (Pl. Dep. 58:16-19).

94. Plaintiff was encouraged to take clients or potential clients out on the town in order to
foster good relationships and increase sales.  (Pl. Dep. 185:12-15)  She would take her clients
"to dinner . . . golfing, U.S. Open, baseball, then any Equant sponsored events. . ."  (Pl. Dep.
60:2-6).

95. Plaintiff was reimbursed for approximately $4,000 to $5,000 of client entertainment
expenses in 2004 alone.  (Pl. Dep. 62:4-13).

96. To the extent required, Mr. Connolly approved any request for client expenses
plaintiff ever requested.    (Pl. Dep. 61:19-62:3).

97. Plaintiff's managers joined her at some of the events to which she brought her clients.
(Pl. Dep. 62:14-18).

98. Plaintiff does not have any knowledge of any particular business that was won as a
result of any male employee taking a client to a topless club. (Pl. Dep. 58:20-23).

99. Plaintiff has no knowledge of any Equant employee receiving any type of promotion
or bonus as a result of taking a client to a topless club.  (Pl. Dep. 58:24-59:25; 189:13-190:5).

100.    Plaintiff agrees that it is possible that female employees at Equant may have gone
to topless clubs with clients. (Pl. Dep. 188:5-8).

101.    Although Mr. Rothstein has won a lot of business with the client that he allegedly
took to a topless club, plaintiff believes Mr. Rothstein also took that client to steakhouses, the

U.S. Open, dinner cruises, etc. She has no facts upon which to base a belief that any specific

business was generated from taking that client to a topless club. (Pl. Dep. 58:20-59:20).

## Golf Outing

102.    Plaintiff claims that Equant had a policy or practice of excluding women from

Company-sponsored events. (Am. Compl. ¶¶ 61-72).

103.    The only event she believes women have ever been excluded from was an annual

client golf outing that, since 2003, Equant had held at the exclusive Baltusrol Golf Club in New

Jersey. (Pl. Dep. 73:16-75:5).

104.    Prior to 2003, plaintiff participated in the annual Equant client golf outing. (Am.

Compl. ¶ 38; Pl. Dep. 74:2-25, 185:17-13).

105.    She was not, however, invited to play at the Baltusrol event in 2003 or 2004. (Pl.

Dep. 74:10-16, 80:24-81:12).  She and others who did not play in the outing were, however,

invited to attend the dinner afterward in 2004. (Am. Compl. ¶ 37; Pl. Dep. 80:24-81:2).

106.    Approximately thirteen foursomes participated in the golf portion of the event in

2004. (Pl. Dep. 75:6-10; *see* List of Golf Foursomes, attached as Exh. 24 to Connolly Decl.).

107.    As a general matter, there was typically one Equant employee assigned to host

each foursome, thus, there was room for approximately fourteen Equant employees to play golf.

*(See* Exh. 24 to Connolly Decl.).

108.    In 2004, Equant had approximately 450 employees within its United States sales

organization. (Bird Decl. ¶ 5).

109.    The substantial majority of Equant employees who played golf at the Baltusrol

event in 2004 were members of Equant management. *(See* Exh. 24 to Connolly Decl.).

110.    Kevin Johnston generally arranged the foursomes and decided which clients and

which Equant employees would be invited to play. (Connolly Decl. ¶ 30).

21

111.    Plaintiff was far from the only salesperson who was not invited to play golf at the 2003 or 2004 annual Baltusrol golf outing. (Pl. Dep. 77:11; *see* also Exh. 24 to Connolly Decl.).

112.    No "non-golfers" were invited to the Baltusrol golf outing. (Pl. Dep. 79:2-82:22).

113.    Aside from herself, plaintiff cannot identify a single other female employee whom she believes should have been invited to play golf at the annual Baltusrol client golf event. (Pl. Dep. 79:2-82:22).

114.    Plaintiff readily agrees that she was not a "serious" golfer. She did not belong to a golf club or a country club, did not know her handicap, and did not know what she would typically shoot for 18 holes of golf. (Pl. Dep. 99:16-100:12). In fact, plaintiff testified: "I'm not that serious. . . . I usually will just keep up with the group and pick up my ball if you have a bad shot, you know, I don't really keep score for myself." (Pl. Dep. 100:6-12).

115.    Plaintiff's sole basis for believing she was not invited on account of her gender was that she considered it "strange how there are no women." (Pl. Dep. 82:11-17).

116.    Plaintiff took clients out to play golf on other occasions and, at times, her managers accompanied her. (Pl. Dep. 74:2-22, 82:23-7).

117.    Aside from this annual golf outing, plaintiff could not identify any other Company-sponsored event from which she believes she or other women were excluded on account of gender. (Pl. Dep. 81:19-23).

118.    Plaintiff is not aware of any opportunity for advancement or bonuses that were denied to female employees at Equant because they did not play in the annual Baltusrol golf outing. (Pl. Dep. 186:5-9, 189:13-190:6).

119.    Plaintiff does not believe that the fact that no women attended the golf outing

resulted in a deficiency of women holding senior management positions at Equant. (Pl. Dep.

186:10-13).

120.    Plaintiff does not have any facts that cause her to believe that women as a class

were not promoted at the same rate as males because they did not attend such events as the golf

outing or topless clubs. (Pl. Dep. 189:13-20).

## Plaintiff's Disparate Treatment Claims

121.    The Employee Handbook contains the Company's Policy Against Harassment

and Discrimination, which states:

> Equant strives to maintain an atmosphere that is free from illegal
> discrimination or harassment of any kind, including discrimination
> or harassment on the basis of an individual's race, color, religion,
> sex (including pregnancy), age, disability, marital status, sexual
> orientation, national origin, veteran status, or any other
> characteristic protected by federal, state or local law.
>
> The Company encourages employees who feel that they have been
> the subject of, or have witnessed, any type of unlawful harassment
> or discrimination to report the conduct using the complaint
> procedure described below. Any employee found to have violated
> the Policy Against Harassment and Discrimination will be subject
> to such disciplinary action as the Company deems appropriate, up
> to and including immediate termination.

(Exh.1 to Bird Decl.).

122.    Plaintiff has identified three adverse employment actions that she claims to have

experienced on account of her gender: (1) not receiving the "very large lucrative accounts," (2)

not being promoted, and (3) not being paid a "fair amount" of compensation for the BONY

SMARTnet transaction. (Pl. Dep. 34:12-42:12, 43:10-12).

123.    Plaintiff does not believe that Mr. DelVecchio, Mr. Madden, Mr. Johnston or

Howard Ford harbored any discriminatory animus on account of her gender. (Pl. Dep. 34:8-10).

124.    The only two managers at Equant that plaintiff believes were biased against her on account of her gender were Sean Connolly and Bruce Smith.  (Pl. Dep. Pl. Dep. 32:12-34:15).

125.    Plaintiff believes Mr. Connolly is biased against her because she has not been promoted during her tenure.  She also speculates he "arranges the Baltusrol event" and was the "ultimate person that would approve employees bringing clients to strip clubs." (Pl. Dep. 32:17-33:16).

126.    Plaintiff believes that Mr. Smith was biased against her because of her gender because he would have approved Francois Grenot's sales compensation payment (as discussed below at Facts ¶¶ 162 to 173) and because he would have to "grant the attendance at the Baltusrol event." (Pl. Dep. 33:17-34:3).

127.    Neither Mr. Connolly nor Mr. Smith has ever made any gender-related comments that plaintiff was aware of.  (Pl. Dep. 34:11-15).

128.    Aside from the alleged comments of Mr. DelVecchio, (Facts ¶¶ 133, 146, 180) with whom plaintiff shared a good relationship and whom she did not believe was biased against women, plaintiff has not been subjected to any other sexist comments during her tenure at Equant.  (Pl. Dep. 21:21-24:10, 46:22-3, 72:10-13, 104:2-16).

**Account Selection**

129.    Plaintiff was asked to identify any so-called lucrative accounts that she believes were not assigned to her because of her gender.  (Pl. Dep. 35:9-36:10, 91:24-92:10).

130.    Plaintiff testified that in or around 1999 or 2000, Mr. DelVecchio assigned the Western Union house account to Eddie Brand, who was a new sales employee.  (Pl. Dep. 44:2-19).

24

131.    Plaintiff also testified that the account of Deutsche Bank was a "very large opportunity" that Mr. DelVecchio assigned to a male, David Echols, in or about 2000. (Pl. Dep. 44:2-24).

132.    Plaintiff alleges that she argued with Mr. DelVecchio regarding the assignment of Deutsche Bank and Western Union to Mr. Echols and Mr. Brand, respectively. (Pl. Dep. 44:2-46:24).

133.    Plaintiff alleges that in response to her stated concerns, Mr. DelVecchio stated to her that "they were both lucrative opportunities and that he had to give it to somebody who had a family to feed, had kids at home and, you know, put food on the table where I was a single, I wasn't married, I was a single girl." (Pl. Dep. 46:17-47:3).

134.    Aside from the Western Union and Deutsche Bank accounts that were assigned to men in or about 1999 or 2000, plaintiff does not believe that there were any other accounts at Equant that were not assigned to her because of her gender. (Pl. Dep. 99:4-11).

135.    Plaintiff speculates the Western Union account was not assigned to her solely because she had heard that the CIO liked going to Hooters for lunch and to strip clubs. (Pl. Dep. 98:8-99:3).

136.    Mr. Brand has never been asked by Western Union to go to Hooters or to a topless club, nor has he ever taken any client, including Western Union, to such an establishment. (Declaration of Edward Brand ("Brand Decl."), attached as Exh. F, ¶ 3).

137.    Although plaintiff claims Western Union was a very lucrative account, BONY, which Mr. DelVecchio assigned to her, has generated approximately $15 Million in revenue per year. The annual business for G Trade, which was also assigned to plaintiff, has increased from

25

approximately $10,000 a year in 1999 to approximately $800,000 in 2002, and to approximately a million a year after 2004. (Pl. Dep. 64:3-19).

138.    Plaintiff was also assigned to the Merrill Lynch account. She claims that this was a "very disgruntled customer" and was a "difficult" account, however, she acknowledges that this account has consistently generated approximately a million dollars of sales per year. (Pl. Dep. 29:6-25, 62:22-63:4).

139.    In fact, the accounts for which plaintiff was given responsibility were sufficiently lucrative for her to be named to the President's Club at Equant for her sales achievements in 2002 and 2004. (Pl. Dep. 63:13-66:23).

140.    President's Club is a status that was reserved for the top sales performers globally. (Pl. Dep. 63:13-66:23).

141.    In 2002, plaintiff was the second highest sales performer in North America. (Pl. Dep. 64:17-65:9).

142.    Indeed, throughout plaintiff's tenure with Equant, she has consistently been one of the top salespeople at Equant. (Pl. Dep. 97:6-11).

**Promotions**

143.    The Equant Employee Handbook contains a section with respect to Posting for and Applying for Open Positions. (Exh. 1 to Bird Decl.). In pertinent part this section states:

> To support the Company's policy of promoting internal career mobility, Equant encourages employees to apply for open positions in the Company for which they are qualified. . . . To apply for a posted position, employees who meet the above criteria should forward their resume to the recruiter identified on the job posting within the period designated on the posting.

(Exh. 1 to Bird Decl.).

26

144.     There is an internal posting board and application process at Equant. (Connolly Dep. 199:9-201-7).

145.     Plaintiff claims that in1999, Mr. DelVecchio once told her that Equant had a "glass ceiling for women and not to really expect a promotion." (Pl. Dep. 71:19-72:13).

146.     Plaintiff does not recall Mr. DelVecchio elaborating on this subject or providing any particulars. (Pl. Dep. 72:2-13).

147.     Plaintiff could not identify any positions that were denied to her at Equant on account of her gender. (Pl. Dep. 38:16-40:14). Indeed, she presented testimony that Sean Connolly had hired a woman for one position she had applied for. (Pl. Dep. 38:9-14, 43:13-17; *see also* Connolly Dep. 203-6-205:11).

148.     Plaintiff also claims that she should have been considered for one of several Principal Consultant roles that were created as part of the Professional Services organization. The positions were filled externally. (Pl. Dep. 41:8-21).

149.     Plaintiff believes Mr. Connolly made the hiring decisions for those positions. (Pl. Dep. 41:8-42:24). However, plaintiff never spoke with Mr. Connolly to express an interest in these positions. (Pl. Dep. 41:8-42:24).

150.     Although it is unclear precisely which Principal Consultant positions she was referring to at her deposition, Mr. Connolly was not the hiring manager for any of them nor did she apply for any of them. (Connolly Decl. ¶ 31).

151.     Moreover, even if plaintiff had applied, it is clear from the job descriptions for the various Principal Consultant positions, that she would not have been qualified for these highly technical roles. (Pl. Dep. 41:8-42:24; *see also* Principal Consultant Job Description, attached as Exh. 4 to Bird Decl.).

27

152.    In addition, plaintiff claims that "opportunities [for promotion] are not present" at

Equant. By this claim, plaintiff means:

> Our management doesn't do a good job of saying you know where your next
> step is and where you can go from here, so you really have nobody guiding
> you and promoting you through the organization . . . so I don't have my
> management or even my senior management, Sean Connolly, saying, you
> know, Christine Citro would be a good fit for a principal consultant.

(Pl. Dep. 40:15-41:3).

153.    Although plaintiff was not in attendance, she claims that she heard from others

that at a meeting in early 2005, someone asked management when Equant planned on promoting

female employees and that this question was met with a round of applause. (Pl. Dep. 184:17-

185:11).

154.    Plaintiff could offer no additional facts to support her claim that she had been

denied promotions on account of her gender. (Pl. Dep. 42:19-24).

## BONY SMARTnet Transaction

155.    Plaintiff believes that the decision not to pay her what she believed she was owed

in sales compensation on the BONY transaction was on account of her gender. (Am. Compl. ¶¶

95-101).

156.    Plaintiff's male managers, Mr. Johnston and Mr. Madden, similarly were not paid

the sales compensation to which they believed they were entitled on the BONY transaction.

(Connolly Decl. ¶ 24; Exh. 20 to Connolly Decl.).

157.    Equant contemplated compensating Mr. Johnston and Mr. Madden in payment

calculated in precisely the same manner as it had offered to pay plaintiff. *See* October 19, 2004

E-Mail from Wentworth to Treece, Macchiarola, Connolly, attached hereto as Exh. 23 to

Connolly Decl.).

158.    Ms. Gaffney -- a female employee -- with responsibility for sales compensation at Equant, expressed her unequivocal conclusion to senior management that the BONY SMARTnet transaction was an SBO that fell within the SBP and that, due to the slim margin, total monies due and owing to plaintiff on the BONY SMARTnet transaction was approximately $15,000. (Exh. 6 to Gaffney Decl.).

159.    Mr. Connolly did not have the authority to, nor did he, make the decision concerning plaintiff's compensation on the BONY SMARTnet transaction. (Connolly Dep. 16:21-17:8, 24:13-21, 25:2-21). Mr. Connolly did, however, repeatedly lobby senior management on plaintiff's behalf in an effort to obtain additional compensation for plaintiff on the transaction. (Facts ¶¶ 51-64; *see also* Connolly Dep. 19:25-20:17, 145:8-13, 158:23-159:16, 160:17-161:18).

160.    Equant offered plaintiff $90,000 in sales compensation, which far exceeded the amount to which it believed she was entitled under the terms of the SBP. (Connolly Decl. ¶ 25; Pl. Dep. 85:22-86:20, 88:17-89:4, 151:2-9).

161.    Plaintiff's sole basis for claiming that her gender was a factor in the dispute over sales compensation on the BONY SMARTnet transaction is that she learned that Francois Grenot, a male salesperson, had also had a dispute with management over sales compensation on a transaction that closed in 2003, but that Equant had allegedly ultimately agreed to pay him 80% of what he believed he was entitled to. (Pl. Dep. 66:25-69:9; Gaffney Decl. ¶¶ 9-13). The circumstances surrounding Mr. Grenot's compensation issues in 2004, however, bore no resemblance to those of plaintiff. (Gaffney Decl. ¶ 16).

162.    Plaintiff testified that she knew very few details of the sales compensation dispute between Mr. Grenot and Equant other than the fact that it stemmed from a network sale with

29

"negative margins." (Pl. Dep. 67:9-25). She had no idea of the overall value of the transaction other than her belief that it was in the "double digit" millions. (Pl. Dep. 68:4-69:13).

163. Plaintiff believed that, based on its value, the deal that Mr. Grenot had closed should have fallen under the SBP. (Pl. Dep. 68:21-69:9).

164. Mr. Grenot was a French national employee of Equant whose role was to sell products and services to French customers of France Telecom ("FT") in the United States. (*See* Gaffney Decl. ¶ 9).

165. At the time, FT was a majority owner of Equant. (Gaffney Decl. ¶ 10).

166. In fact, Mr. Grenot believed that the transaction should have been treated as an SBO under the SBP and that, under the terms of the SBP, Mr. Grenot was entitled to sales compensation of $330,920. (Gaffney Decl. ¶ 12; *see* E-Mail from Connolly to Sampic, attached hereto as Exh. 21 to Connolly Decl.).

167. Equant ultimately agreed that the transaction did fall under the SBP. The SBP expressly stated that FT-originated outsourcings qualified under the SBP and, moreover, that they were not subject to an adjustment on low margin. (Gaffney Decl. ¶ 13; Exh. 1 to Gaffney Decl.).

168. However, Mr. Grenot had partnered with FT employees on the AXA transaction, who were not eligible to share in the bonus pool under the SBP as they were not employees of Equant. (Gaffney Decl. ¶ 14).

169. Mr. Grenot was ultimately paid $257, 276 payable in two installments. (Gaffney Decl. ¶ 15; *see* June 18, 2004 Letter from Koebel to Grenot, attached hereto to as Exh. 22 to Connolly Decl.).

30

170.    Plaintiff believed that, in resolving his sales compensation dispute, Mr. Grenot
was also benefited by the fact that he was French and that purportedly there was an FT executive
who had helped him to settle his compensation dispute. (Pl. Dep. 70:3-71:18).

171.    Although plaintiff speculated about the individuals involved in approving Mr.
Grenot's sales compensation, she did not know with certainty. (Pl. Dep. 69:14-70:11).

172.    Based solely on Mr. Grenot's situation, plaintiff believes that, if she were a man,
she would have been paid close to 100% of the $540,000 in commission to which she believes
she is entitled. (Pl. Dep. 96:12-97:5).

173.    Plaintiff acknowledged that she received accolades from senior management for
contributing to the successful closing of the BONY SMARTnet transaction. (Pl. Dep. 165:20-
166:12). In particular, plaintiff recalls receiving praise from Bruce Smith and Sean Connolly.
Moreover, plaintiff's President's Club award for 2004 was announced before the entire sales
team. (Pl. Dep. 165:20-166:12).

174.    In 2004, Mr. Connolly invited plaintiff to participate in a roundtable discussion
with Daniel Caclin, the President of Equant, during which they discussed the morale and current
state of the sales team. (Pl. Dep. 170:8-171:10). Plaintiff considered it an honor to be invited to
the roundtable discussion and "sit with our CEO." (Pl. Dep. 172:12-18).

175.    Plaintiff is not aware of any other bonuses that she believes were not paid to her
on account of the fact that she was a woman. (Pl. Dep. 97:12-19.)

## Plaintiff's Hostile Environment Claim

176.    The Employee Handbook contains Equant's policy on Sexual Harassment.
Specifically, and in pertinent part, the section provides:

> It is Equant's policy to maintain a working environment free from
> sexual harassment or conduct that might reasonably be perceived
> as constituting sexual harassment.

31

. . .
All employees must comply with this policy and take appropriate
measures to ensure that such conduct does not occur.

(Exh. 1 to Bird Decl.).

177.   Plaintiff claims that she was subjected to a hostile environment while working at
Equant. (Am. Compl. ¶¶ 85-94).

178.   In support of her hostile environment claim, plaintiff can cite to no additional
evidence beyond that which is recited above. (Pl. Dep.104:2-16)

179.   She has not identified any sexual conduct to which she was ever exposed at
Equant. Rather, her claim for hostile environment is limited to:

> a.   The comment allegedly once made by Pat DelVecchio in or about 1999 or
> 2000 in which he expressed his opinion that there was a "glass ceiling" at Equant. (Pl.
> Dep. 71:19-72:13).
>
> b.   The comment allegedly once made by Mr. DelVecchio in or about 1999 or
> 2000 to the effect that the Merrill Lynch and Deutche Bank accounts had to go to
> salespeople who were married with children. (At another point in her deposition,
> plaintiff testified that he had stated that the accounts "had to go to a male employee
> because he had a family to feed.") (Pl. Dep. 35:9-16, 46:17-21).
>
> c.   Although she was not in attendance, audience members allegedly cheered
> when management was asked at a meeting when women were going to start getting
> promoted at Equant. (Pl. Dep. 184:17-185:11; *see also* Connolly Dep. 207:18-211:21
> (recalling that at a Leadership Team meeting someone said "I would like to see more
> women in the Leadership Team, something to that concept")).
>
> d.   Rumors of male salespeople taking clients to topless clubs. (Pl. Dep. 47:18-
> 58:23).

e. The fact she was not invited to play golf at the Baltusrol golf events in 2003 and 2004. (Pl. Dep. 74:10-16, 80:24-81:12).

180. Prior to 2004, plaintiff never complained of any conduct that allegedly created a hostile work environment. (*See* Pl. Dep. 107:4-108:19). In or around the fourth quarter of 2004, only after the dispute arose concerning her sales compensation on the BONY SMARTnet transaction, plaintiff spoke with representatives from Human Resources regarding alleged concerns about discrimination at Equant. (Pl. Dep. 107:15-108:19). Her stated concerns were substantially similar as set forth above, provided that she also complained that it was national origin discrimination to hold the trip for President's Club winners in the Middle East. (The trip was subsequently moved to Scotland). (Pl. Dep. 107:4-113:24).

181. Mr. DelVecchio, the only individual to have ever made any allegedly offensive comments and with whom plaintiff enjoyed a good working relationship, was not involved in any decision concerning any aspect of plaintiff's employment once he ceased being her manager in 2001 and had no involvement in determining her compensation from the BONY transaction. (Pl. Dep. 187:15-22).

182. Plaintiff filed her charge with the Equal Employment Opportunity Commission on December 28, 2004. (*See* EEOC Charge, attached as Exh. 4 to Garofalo Decl.).

183. In April 2007, the parties in the above referenced matter stipulated in writing to the withdrawal, with prejudice, of plaintiff's claim of pregnancy discrimination. The stipulation is attached hereto as Exh. 5 to Garofalo Decl.).

Dated:     Hartford, Connecticut
         May 17, 2007

                      **THELEN REID BROWN**
                      **RAYSMAN & STEINER LLP**

                      Attorneys for Defendant

                      By: __/s/ Beverly Garofalo__
                            Beverly Garofalo (BW 7425)
                            Thelen Reid Brown
                            Raysman & Steiner LLP
                            185 Asylum Street, CityPlace II
                            Hartford, CT 06103
                            (860) 275-6400
                            (860) 275-6410 (fax)

HARTFORD 148848v12

## TABLE OF EXHIBITS

A. Declaration of Fran Bird

    1. Employee Handbook versions 2001, 2004

        a. Company's Policy Against Harassment and Discrimination

        b. Posting for and Applying for Open Positions

        c. Sexual Harassment Policy

    2. Equant Codes of Conduct, November 2003, May 2005

    3. Principal Consultant Job Descriptions

    4. E-Mail dated June 4, 2004

B. Declaration of Beverly Garofalo

    1. Deposition of Christine Citro-LoGiudice

    2. Deposition of Sean Connolly

    3. Letter from Brian Condon, Esq., dated December 21, 2004

    4. Equal Employment Opportunity Commission Charge, dated December 28, 2004

    5. Stipulation for Pregnancy Claim

C. Declaration of Sean Connolly

    1. E-Mails dated between March 31, 2004 and April 2, 2004

    2. E-Mail dated January 30, 2004

    3. E-Mails dated February 2004

    4. Letter to Jennifer Oakes, dated February 3, 2004

    5. E-Mails dated March 2004

    6. E-Mail dated February 3, 2004

    7. E-Mail dated February 19, 2004

8.  E-Mail dated January 22, 2004

9.  E-Mail dated January 23, 2004

10. E-Mail dated February 1, 2004

11. E-Mail dated March 4, 2004 (to Bruce Smith)

12. E-Mail dated March 4, 2004 (to Kevin Johnston)

13. E-Mail dated April 6, 2004

14. E-Mails dated between June 4, 2004 and June 6, 2004

15. E-Mail dated June 7, 2004

16. E-Mail dated June 21, 2004

17. E-Mail dated June 15, 2004 and June 14, 2004

18. E-Mail dated July 27, 2004

19. Purchase Orders

20. E-Mail with Calculations

21. E-Mail to Gerard Sampic

22. E-Mail dated June 18, 2004

23. E-Mail dated October 19, 2004

24. List of Golf Foursomes

25. 2004 Goal Sheet

D.  Declaration of Caren Gaffney

1.  Equant's 2004 Sales Compensation Plan

2.  PowerPoint Presentation

3.  E-Mail dated June 16, 2004

4.  E-Mail dated August 9, 2004

2

E.  Declaration of Norm Wentworth

　　　1.  E-Mail dated December 15, 2004

F.  Declaration of Edward Brand